Thank you, Your Honors. May it please the Court, Michael Bushbacher for the petitioners. I will be splitting my time this morning with Patrick Valencia of Iowa, who will be taking 10 minutes. I'll take the remaining 20. With the Court's permission, I'd like to reserve six of those minutes for rebuttal. This case truly is about one of the most important numbers that almost nobody has ever heard of, the petroleum equivalency factor. This tells the Department of Energy to calculate the petroleum equivalent fuel economy value for electric vehicles. That number then gets plugged into the compliance calculation for the Corporate Average Fuel Economy Program. When the Department of Energy made the PEF that we're challenging here, it first looked in its proposal at a 2000 rule that included what they called a fuel content factor that multiplied the real-world efficiency of electric vehicles by over 666 percent. The agency said correctly, in our view, that that had no basis in Section 32904 or Section 32905. It was simply an extra statutory factor. That inflated value was the agency proposed to get rid of in the final rule. The reason why we're here is because they didn't. Automakers complained and said that it would make the CAFE standards too stringent in real-world terms and would cost them billions and billions in fines and penalties. It said that the automakers said that it would get in the way of the current administration's push to electrify the nation's vehicle fleet by 2030, up to 50 percent. It did a 180. The agency did a 180 in its final rule and readopted, that's the word the government uses, the 666 percent multiplier fuel content factor. That's illegal. There is no basis, as the agency correctly noted in the first instance, for this multiplier to be there. It makes an enormous difference to the real-world stringency of the CAFE standards. It is the basic number used for ethanol, right? That's correct. So you say no basis. Why isn't ethanol a comparator? When Congress created Section 32905, it made a fuel content factor for ethanol, for E85 and for some other types of alternative fuels and expressly carved out electric vehicles from that calculation. This is the reason why we've got a problem with it. When Congress creates something, an agency can't then come along and put that over where Congress hasn't said they can. Instead, the four factors that the agency has to consider under 32904, which is expressly mentioned in 32905, the four factors are all real-world practical considerations that the agency needs to look at. Number three is? Number three is, you put your finger right on the nub of it, the third factor is the need of the United States to conserve all forms of energy and the relative scarcity and value to the United States of the fuels used to generate electricity. So that, the agency has never, since 1980 when this was first enacted, until this rule, has never proposed reading that to create any kind of broad-ranging, basically infinite policy lever to drive electrification. Is this kind of a reverse Chevron argument? Well, I think they've always done it this way, and we ought to defer to them? Well, I think there is, even under Loper-Bright, original interpretations that an agency has can be entitled to wait. We don't need Chevron to, there's no Chevron issue here that cuts against us. The agency rightly interpreted that in 1980 as dealing with cost, and it looked at the scarcity and value and said this has to do with the relative cost, and it's about comparing the fuels that are used to generate electricity, so natural gas, coal, versus petroleum, gasoline, and diesel. And that comparison is the point after all of the entire provision. And that was ratified by Congress on two separate occasions when it modified the statute and amended it in 1988 and in 1992. After that, in 1994, they got a little more curious about what the word scarcity means there and got kind of tied up in knots, proposed doing something about it in 1994, concluded in 2000 that they really couldn't figure out how to do something that would work. And in 2000, they concluded that it really didn't cut either way. It was about comparing different fuel types, all of which were abundant, and so that there was no need to worry about it. In the final rule here, they've adopted a novel interpretation that's never been proposed before that says that somehow scarcity or the efficiency of electric vehicles allows the agency to have a power to determine for itself what the right level of incentive is for electrification. Are they prohibited from adopting a novel interpretation? Well, if the statute doesn't allow it, yeah. And so here the statute says it's a real world comparison. Relative means a comparison. Relative scarcity and value. Value at least definitely refers to cost. And then scarcity, I think, also has a cost component to it. I think there may be some flexibility and discretion about the methodology that the agency uses to make that determination, but it's not an infinite policy lever. They don't have to stop. On their approach, they don't have to stop at 666 percent. They could go to 6,666 percent or 6 million or infinite. And that enormous power here hiding in the third of four factors in an ancillary provision about how the Department of Energy is going to calculate a number that's then used by the EPA to then tell the Department of Transportation who's complying with the Corporate Average Fuel Economy Program, that is a pretty big elephant to find in a pretty small mousehole in my view. The key thing, I think, with the factor also is that the agency has never come up with an explanation for how its reading makes any sense. And that is in itself arbitrary and capricious. So it says in the final rule, it mentions two things. One is the efficiency of electric vehicles. Well, the efficiency of electric vehicles is the first factor, so it's already in the  And so they're essentially double counting there, which is wrong. And then the second point they make is they talk about scarcity, but then later, and you can read this on page 32 of the government's brief, the government says that scarcity was not central to the analysis. So I'm not sure what is. That's an internally inconsistent explanation, which is arbitrary and capricious. And it in no way gets to the best reading of the statute. Of course, in Loper-Bright, the best reading is the only reading that can control. And here, I think also there's a West Virginia versus EPA sort of issue as well, because the power claimed, as I mentioned, is truly enormous. And if you're going to claim the ability to make billions of dollars of change in the auto industry, and of course, electrification is a pretty salient political issue, if you're going to do that, you're going to need something clearer than what, you know, like in West Virginia versus EPA statute that's a little-used provision that's a relative backwater. And another way of looking at this might be to say, well, what are the things that would have to be right for the government's reading to pass muster? First thing is that the words relative scarcity and value and the need of the United States to conserve all forms of energy are just so vague and open-ended that really any kind of methodology to incentivize electric vehicles is okay as long as you're looking at energy policy. I just don't see that in any of those words. The second is that you'd have to look at the rest of the factors and conclude that they're basically meaningless. They can ignore them and supersede them very easily by this third factor. In other words, who cares what the efficiency, the real-world efficiency of electric vehicles is? Who cares what the upstream generation and transmission efficiency is? Who cares what the differences in driving patterns are if the agency can decide for itself what the right incentive is? And then zooming out one level further, it would have to be that when Congress created 32905 and expressly carved out electric vehicles in the PEF 32904 statute from that, that it didn't really mean it and that that same fuel content factor that Congress created can be just brought in out of whole cloth by the agency. I think all of those interpretive steps that you'd have to get there are wrong. And the ultimate point is that the decision about whether to incentivize electric vehicles lies with Congress, and they have, and actually the agency makes a big deal about this in a rule, talking about all the subsidies, all the incentives, the charging infrastructure, all these things Congress has invested in, and then says, but more is needed and we're going to use this statute from 1980 to do it. I think that, I think it's correct when the agency looked at it the first time and said that just has no basis in any part of the statute. So I'd like to also cover briefly some of the arbitrary and capricious arguments that we've made on some of the other points and the other statutory points. Are you going to be the counsel to address the standing issue? I'm happy to address standing, Your Honor. We'll proceed. Tell us, why is there standing present? So standing in this case is not hard. Under Massachusetts v. EPA, increases in carbon emissions, especially if a state has a coastline as the state of Florida, which is part of our coalition, does, that, if you have a policy that increases carbon emissions, Massachusetts v. EPA's binding holding is that the state has standing. And it's undisputed here, using the government's own modeling, that their final rule will increase carbon emissions by, their estimate is over two and a half million metric tons. That it will also increase the number of electric vehicles on the road by three quarters of a million, which brings me to the second standing point, which is the road wear that happens from increasing electrification. Batteries are heavy. They're a lot heavier than gasoline. And so an equivalent or comparable electric vehicle weighs 20 or more percent more than an internal combustion engine vehicle. And that means that they wear down the roads. And of course, roads have to be maintained by someone, and that someone is the state. The state has to pay for it. So we have 13 states in this coalition, all of whom have lots of roads. And so that road wear issue is more than sufficient to justify standing there. The third point, and this goes to my client, the American Free Enterprise Chamber of Commerce, which is an associational group that has members that sell ethanol. And it's undisputed in the government's own data that it's going to depress demand, the rule will depress demand for liquid fuels, by something like 100 million gallons. So about 10 to 12 percent of that's going to be ethanol. So that hurts demand for their products. It's well established. The Energy Futures Coalition case out of the D.C. Circuit and several others make very clear that if a government policy hurts the demand for your product in a direct way, it's reasonably foreseeable that that's going to happen. You have standing. So those three points, each of which are backed by the government's own modeling and data, justify our standing. I do want to say something about the standing and mootness distinction. So one of the issues that the government tries to take us to task for is it says, hey, you didn't take account of these EPA rules in your opening brief. But those EPA rules, as their own brief says, happen subsequent to this rule. In fact, this rule doesn't consider the possibility of those rules. There's a footnote in their brief where they say it's not their job to do that. Well, same for us. And that point means that we're really in mootness land. This is West Virginia versus EPA. Not the major questions part of it, but the standing part of it is exactly right when it says there's a Freudian slip. So too here. There's a Freudian slip in the government's argument. We're talking about mootness. The burden is on them. And they haven't met it. Also, the notion, and they don't, I want to be clear, they do not challenge our standing in any sort of material way aside from saying that the EPA rules moot it out. Now, the EPA rules under challenge right now, too. That's right. Everyone who's in this case is also challenging those. Including your client. Including my client, yes. And what's the status of that case? It's pending before the D.C. Circuit. Well, pending. Is argument scheduled? Are you in briefing? What is pending? We're in the middle of briefing. Thank you. Yes. So we filed our opening brief back in September. The government just filed its response. And what's the style of that case? What do you mean by that, sir? You know the style. The caption, whatever you call it. Oh, that is. That's an old-fashioned term. Yes, yes. I'm sorry about that.  That one is, there are a bunch of these, so I'm trying to remember which one. Our clerks can find it. Okay. Thank you very much. D.C. Circuit, you said, right? Yes, sir. Thank you. Proceed. So that point of the mootness and standing point is an important distinction, so I do want to make that clear. Last, the argument that the government makes that we are somehow boxed out by the rules, as you were talking about, the fact that we're challenging these rules separately does mean that the path to victory requires winning two cases. But when you're looking at standing, you don't prejudge the merits. And so under the Kadara case and some other cases, it's a Third Circuit case by then-Judge Alito, and under precedence from this Court. There is no question that that doesn't moot our case out. I see that my time has expired, and unless the Court has further questions, I'll reserve the rest of my time for rebuttal. Thank you, Mr. Pushparker. Mr. Valencia? Good morning, Your Honors. May it please the Court. My name is Patrick Valencia, and I represent the State of Iowa and the Coalition of State Petitioners here. States want fair rules to ensure safe, affordable, and efficient cars for those who live in our states. The final rule does not achieve those ends. Electric vehicles are still significantly more expensive to make than gas-powered vehicles, but car manufacturers need to use electric vehicles to comply with their regulatory requirements. So they increase the cost of gas-powered vehicles, thus forcing our citizens who buy gas-powered cars to subsidize the cost of those electric vehicles. The problem is the regulatory requirements are driven by an artificially inflated fuel economy factor. They don't increase the efficiency of vehicles, nor do they decrease carbon emissions. This results in less affordable, less efficient cars for the citizens of our states. And it is like a congressional testimony so far. Tell me where the legal point is. The legal point, Your Honor, here is, as my colleagues have talked about, that the final rule here is contrary to law and it's arbitrary and capricious. And one point I want to start on is what we sort of wrapped up there with is why the states here are standing and why the private petitioner in American Free Enterprise has standing. And so I'll start by talking about the distinct and predictable harms that the states face from the final rule. To answer the Court's question about the EPA case in the D.C. Circuit, the case number for that is 24-1087. But starting with the harms that the states are facing here, the first is this Massachusetts v. EPA harm caused by an increase in emissions. It is undisputed that emissions will increase because of the final rule, and it's undisputed if you look at the world from our modeling, which doesn't take into account the EPA regulations. But it's also undisputed if you do take into account the EPA regulations as the agency's modeling does. The agency's modeling shows that there will be at least a 2.29 million metric ton increase in carbon emissions. That is not minor. That's the equivalent to over 500,000 gas-powered cars being driven for one year. That's a lot of emissions and that harms our states under the Massachusetts theory of standing. The second theory of standing that we have is this pocketbook injury to states caused by the increase in the number of electric vehicles on our roads. Again, it's undisputed that the point of this rule and the effect of the rule will be to increase the number of electric vehicles on our roads. Electric vehicles, as we've talked about in our affidavits, addendum page 30 and 31, they weigh on average about 20% more than gas-powered vehicles. We're relying on the laws of physics here. If the cars are on average 20% heavier, they're going to do more damage to the roads, and we've talked about that in our affidavits. The damage to the roads then falls on the states to repair them, to keep them up, to deal with infrastructure like guardrails on the highways to withstand 20% heavier impact from 20% heavier vehicles. These are pocketbook injuries directly tied to the states that are undisputed that they will occur. The agencies argue they might be attenuated, but they're not. We are an unregulated entity here, sure, but the predictable effect of the final rule is that automobile manufacturers will increase the number of electric vehicles on the roads, and that causes this direct harm. There are no leaps in logic needed to reach this conclusion. The question about whether the EPA regulations affect our standing, as my colleague has said, those don't go to standing. They go to mootness. The EPA regulations came into effect, or they were published, on April 17th. We filed this petition on April 5th. We obviously deal with standing at the onset of the case, which is April 5th. We don't take into account the EPA regulations. In any event, two independent regulatory... What's your reply that those EPA regulations would moot this case? The reply is two parts, Your Honor. One, when you have two independent regulatory obstacles that are causing us harm at the same time, and we can't challenge them in the same suit, because to challenge the EPA regulations, we have to do that in the DC circuit, and we are, as I mentioned. We're challenging them both. They're not going unchallenged. They don't moot each other out. Otherwise, the effect would be, so long as the federal government passes two rules that are both illegal and both causing harm, or more rules, and you just can't challenge them in the same action, you're always going to lose on mootness, and that's just not how courts have operated. The other point is the factual point, is that the EPA regulations, even if they could moot out this case, they don't, and their modeling shows that. When you combine the effect of the EPA regulations with the NHTSA CAFE regulations here, if you combine the effect, that creates a more stringent standard. It doesn't just, the standard when you combine the two is not equal to the EPA stringency standard. There is a higher effect, and we know that from the agency's own admission. So if you look at the June 2024 NHTSA publication, the agency relied on what they call a side study, and we talk about this in our reply brief. This side study says that the combined effect of the NHTSA regulations, which is what they were talking about in the June 2024 publication, the combined effect of those regulations with the April 2024 EPA regulations is a more stringent standard. That's the agency's own fact finding, and that's what their modeling shows. Their modeling shows an increase, like I said, 2.29 million metric tons more in carbon emissions. It will result in over 500,000, excuse me, I think three quarters of a million more electric vehicles on the roads. Those are undisputed facts that their modeling proves out. The other point is, because the EPA regulations don't move this out, they don't model the effect of the final rule absent the EPA regulations. So our modeling goes undisputed as to the effect of the final rule on its own. So for those reasons that we can challenge two independent regulatory obstacles at the same time in different courts, and for the factual reason that the two regimes combined do actually create a more stringent standard, it doesn't move out the case. And finally, I'd like to just address one more sort of thematic point here. The agencies discussed that our theories of harm are inconsistent. They argue that the, we're saying the increase in emissions is not, could not exist if the number of electric vehicles go up. They say if there's more electric vehicles on the road, obviously then emissions have to go down. Well, one, the modeling, ours and theirs, doesn't show that. But two, that's wrong because they're talking about gas-powered car emissions. What we're saying is emissions on the whole, which is what you have to look at under the statute. So, the decrease in gas-powered vehicle emissions, if that goes down because of this rule, that decrease is actually less than the increase in emissions caused from the power sector. The emissions generated to generate electricity to power these increase in electric cars. And you know, that relies on coal, which is obviously dirtier than gas. So there's an increase in coal-powered emissions, the power sector emissions, and that increase is greater than any decrease we're going to see here under the final rule from gas-powered emissions. So, the theories of harm are actually consistent. But even if they weren't consistent, even if they were inconsistent as the agency says, that we still have standing. Because only one of the petitioners here, they all raise the same claims, only one has to have standing. So, if it is true that the, if gas number of electric vehicles goes up, that the emissions has to go down, though it's not true if it is, then the reliance on liquid fuel goes down with that. And then the private petitioner, American Free Enterprise, would have standing. But if the emissions go up, and the electric, number of electric vehicles go down, then the states have standing because of the harms caused by the increase in emissions. So in any event, at least one petitioner here has standing, and the case is not mooted out by the EPA regulations. If the court has no further questions, I'll save the rest of my time for counsel's rebuttal. Thank you. Thank you, Mr. Valencia. Mr. Koppel. Good morning, your honors. May it please the court. I'm Josh Koppel, for the respondents. Even in 1980, Congress recognized that electric vehicles would promote the conservation of energy, diversify the transportation fuels that the country relies upon, and promote the nation's energy security and independence. So Congress enacted a statutory scheme that incentivizes the production of electric vehicles by providing automakers that produce them with a boost in achieving compliance with the nation's fuel economy standards. Congress instructed the Department of Energy to determine the extent of the compliance boost automakers would get, and the strength of the incentive to produce electric vehicles, by determining a methodology for calculating the fuel economy value of electric vehicles based on a mix of factors set out in the statute. Among other things, DOE has to consider the energy efficiency of electric vehicles, the efficiencies of generating and transmitting electricity, the need of the United States to conserve energy, and the relative scarcity in value to the United States of various fuels. DOE faithfully and reasonably applied those statutory factors in the rulemaking at issue to establish a new petroleum equivalency factor for model year 2027 and beyond. When they talked about, in the statute, about all forms of energy, it appears that the agency ignored sort of the cost of manufacture, cost of disposal, and the energy that would be consumed in that. And if you're directed to consider all forms of energy, well, first of all, did you really do that? And second, if that's the position that the agencies took, what's the legal basis for it? Yeah, the Department of Energy did consider all forms of energy pursuant to this third statutory consideration. And it explained that electric vehicles are substantially more energy efficient than gasoline-powered vehicles, and so they promote energy conservation. It also explained that electric vehicles provide even greater conservation benefits with regard to scarce fuels in particular. Petroleum is, of course, a finite resource. Well, you know, and that's a matter of some dispute at this point. If you look at the amount of oil that exists in the country today, you know, you can take North Dakota, where I come from, you know, in 1990, before the advent of the modern methods of extraction of shale oil, you know, they said that North Dakota was basically sitting on energy that would only be viable if oil got to like six and a half dollars a, you know, a gallon, right? You know, I can't remember, $35, $40 a barrel, something, you know, at a minimum. And then after fracking came along, you understand that we now say that the oil reserves in the state of North Dakota are greater than the oil reserves that exist, that are extractable, are greater than the oil reserves that exist in Saudi Arabia, right? And so how scarce is oil today? It certainly has changed since the 1980s. We thought there was a lot less viable oil extraction possible in 1980 than we do today. The Department of Energy acknowledged that the United States has approximately five years of oil reserves, of petroleum reserves in the country. But it explained that oil and petroleum fuels, oil and petroleum fuel are a global market and supply and demand are subject, can change rapidly and are subject to market constraints and shocks caused by natural disasters or global events. And the third statutory consideration is, that really goes to the heart of this third statutory consideration. EPGA, which established the fuel economy regime, was enacted in 1975 in the wake of the 1973 Arab oil embargo. The particular provision at issue here, section 32904B, was enacted in 1980 in the wake of the 1979 Iran oil crisis. So the, you know, these types of energy security and energy independence concerns are really at the heart of the statute. And so regardless of the United States' petroleum reserves, promoting the use of electricity and diversifying the nation's transportation fuels does promote these statutory goals of energy security and independence. It certainly does, but the question is, is that do you need to take into consideration the cost of the production of electricity and the cost of energy to manufacture lithium-ion batteries and the cost of the energy consumed in the disposal of those items? The Department of Energy accounted for the generation and transmission efficiencies of electricity. You know, that's the second statutory consideration. It specifically did that. And so yes, the Department did account for, you know, all of these various factors that go into the various types of energy. Now, of course, the – In taking account of the cost, did it also take into account the additional emissions from electricity generation using fossil fuels like coal? The department didn't account for emissions. It didn't take into account the environmental effects of the various types – using various types of fuel. It is well established that the use of electricity results in less emissions than the use of gasoline. Electric vehicles result in less emissions than gasoline vehicles, even accounting for those upstream emissions from the production of electricity. And by 2027, the department expects that nearly half of electricity will be produced from renewable sources like wind and solar. So these efficiencies are only going to improve – By what year? By 2027, the year that this new petroleum equivalency factor takes effect. Are the data supporting that projection in the data for the rule? Yes. Yes. The department relied on projections of the electricity grid mix. It explained why it did – you know, which projections it chose. What's the current mix of renewables in supply of the electricity? I'm not sure what the current mix is. I believe that's – I believe it's in the rule. I'm not sure, actually. I'm not sure if the current mix is in the rule, but these are – this is relying on projections. And I don't believe the petitioners have challenged the particular projection, the particular modeling that the Department of Energy selected here. Of course, the need of the United States to conserve energy and the relative scarcity and value to the nation of various fuels doesn't remain static. And that's why Congress delegated to the Department of Energy, with its relevant expertise, the role of considering electric vehicles and electricity production and consumption in promoting these statutory policies. The department found, as I mentioned, that right now the fuel content factor will promote the conservation of energy and does – by incentivizing electric vehicles, but it also determined that as the transportation landscape evolves in the next few years and electric vehicles gain greater market share, the fuel content factor will in the future actually work contrary to the need of the United States to conserve fuel. And that's why the Department of Energy determined to phase out the fuel content factor by 2030. Essentially, DOE decided to do what petitioners want, to eliminate the fuel content factor, but it decided to do that gradually by 2030 rather than immediately and all at once. Counsel, doesn't the statute anticipate that the Secretary of Energy will do this every year? It says each year review the values. Yes, and the Department of Energy has said that it will review the values every year. And when it determines that a change may be appropriate, it will go through the rulemaking process to make that change. But it also – the statute certainly doesn't prevent the Department of Energy from establishing the fuel economy – the petroleum equivalency factor for a few years at a time. As long as it then goes back and reviews to ensure that the petroleum equivalency factor continues to be consistent with the statutory consideration – Does the record reflect there have been annual reviews? I'm not sure if the record – the record does not reflect that. I believe that the reviews are generally done internally. Here the NRDC and the Sierra Club petitioned for rulemaking. And when the Department of Energy determines that it is appropriate to revise the petroleum equivalency factor, it does go through the rulemaking process. In the rulemaking process undertaken here, was there consideration of the market interests that are represented by the petitioners in terms of the impact that the rule would have on them? Were they able to participate in that process? I don't believe that – they were certainly able to participate in the process. And the petitioners here did submit comments. I don't believe that the Department of Energy considered the market impacts or the impacts on fuel producers. That is something that – that is outside of the statutory considerations here. It's not one of the four factors. So the Department of Energy was focused on the four factors here – the four statutory factors. Is ethanol not a form of energy? It is a form of energy. And so, you know, it was subject to consideration here in terms of the need of the United States to conserve energy and the relative scarcity and value of various forms of fuel. Petitioners argued that – Does the record reflect why, as I understand it, the DOE ended up picking .15, the same as ethanol? In the 2000 rulemaking, the Department of Energy established the fuel content factor at 1 over 0.15. That's correct. In this rulemaking, the Department of Energy determined that it was appropriate to phase out that fuel content factor. So beginning in model year 2027, which is the first year subject to the rulemaking here, that number is actually reduced or actually increased because it's a fraction, but it starts to go toward 1, so that the fuel content factor is eliminated, it becomes 1, in model year 2030. Petitioners argue that – Is it coincidental that it comes out to the .15 to start with? Is it coincidental that it's – I know it's in the separate statute. I don't think it's coincidental. In 2000, the Department of Energy explained why it chose that number. It explained that it did so because it makes the system consistent with the way that other alternative fuels are treated, for simplicity. But that number isn't subject to challenge here, again, because that number was established in 2000. It's 25 years too late for petitioners to challenge that rule. Petitioners argue that the value to the United States, this phrase in the third statutory factor, means that the Department of Energy has to focus on price. But that's quite plainly incorrect. If Congress wanted the Department to focus on the price of various fuels, it would have said so plainly. Well, what about the word value? Value means price, counsel. It can include price, but it also means more. And it includes these considerations of, for example, energy security and energy independence. Just because the price of gasoline at the pump today might be $2.80 a gallon, doesn't mean that that is the value to the United States. It might be the value to a particular consumer in this moment. But it's subject to price shocks. It's subject to market constraints based on global events. And the United States gets additional value from relying on fuels that are not subject to those international supply and demand constraints. In any event, price is an inaccurate indicator of the value, even to the consumer, because of course the price of various fuels, including gasoline but also including electricity, is skewed first of all by subsidies and also by externalities. So even if you were to focus only on price, that still wouldn't give you the value of the fuel to the United States. And petitioners really concede this in their reply. They acknowledge that price is not an accurate indicator of value, and they say, well, that's the best we could come up with. But that's not enough. The statutory consideration really includes more, it demands more, and the Department explained what it was considering, and it explained how those considerations tied to the statutory purpose, and its determination was reasonable and consistent with the statute. I'm happy to talk more about the fuel content factor, but unless this Court has further questions, I'll turn to the second issue that petitioners raised, and they didn't have a chance to discuss this, but this is the method that the Department of Energy uses to determine the generation and transmission efficiencies of electricity. And the Department accounts for those generation and transmission efficiencies of electricity over the course of the electric vehicle's lifetime, because it's accounting for the generation and transmission efficiencies of the electricity that the vehicles will actually consume. And petitioners, in their comments on the rulemaking, urged the Department of Energy to account for the generation and transmission efficiencies in 2024, when the rule was promulgated. That, of course, doesn't make sense. That's three years before these electric vehicles are being produced, at least. Now petitioners say the Department of Energy should have accounted for the generation and transmission efficiencies in 2027. But even that doesn't make sense, because, of course, electric vehicles don't consume all of the electricity that they will ever use in the year that they are produced. They consume that electricity over the course of their life, and the Department of Energy explained that the life of an average vehicle is about 15 years. Some vehicles may last as long as 40 years. Counsel, isn't that supposed to be reviewed every year? The generation and transmission? Yeah. Yes. And the Department of Energy explained that if the generation and transmission efficiencies depart from what it expected, that it will go back and revise the petroleum equivalency factor going forward. So this is exactly the kind of thing the Department of Energy will look at every year, and will go through the rulemaking process when necessary. There's evidence to the record they've been doing yearly reviews. That's two or three times that I've ended up at yearly reviews. Is there any evidence there are yearly reviews? I don't think there's evidence in the record, because this record focuses on the rulemaking that the Department of Energy went through. In the rulemaking, though, the Department of Energy does say that it will, at least going forward, continue to do these yearly reviews. And to be clear, I don't think the petitioners have challenged this issue of whether the Department has engaged in yearly reviews. At the very least, it's certainly engaged in a rulemaking in this particular year. Certainly nothing in the statute requires evaluating the generation and transmission efficiencies in the year the automobile is made. Petitioners rely on the word, the, which really tells you nothing about what year the efficiencies refers to. It would, in fact, be more problematic to look at the generation and transmission efficiencies of electricity in, say, model year 2027, when that's not the year that the electric vehicles will be consuming all of their electricity. The petitioners also challenge the Department of Energy's driving pattern factor. The Department found that electric vehicles are, model year 2027 and beyond, electric vehicles are likely to be driven similarly to gasoline-powered vehicles, because they offer capabilities similar to those of gasoline-powered vehicles. That was the proposal and the notice of proposed rulemaking. There were comments supporting the proposal and those opposing. DOE considered the comments and reaffirmed its conclusion. It's important to note, again, that DOE was trying to look at the patterns of use of electric vehicles in the future, model year 2027 vehicles that don't yet exist. So this is an inherently predictive task. How does that predictive task tie to the realities? If you just look at it, that it seems that a significant percentage of electric vehicles, because of their range limitations, are driven mostly for commuting. They're putting fewer miles on those cars in any given year, as opposed to the gasoline-powered vehicles. I mean, if you look at it, like a lot of people have in their garage, they've got one vehicle that's an electric vehicle, they use it for their day-to-day commutes, they put miles on it, but their driving pattern is different than their SUV that's gas-fueled that they drive 300 or 400 miles at a crack when they go places. And in places that are remote and rural, they're like, when I was a district judge, the nearest district judge sitting me in North Dakota sat 240 miles away. It really didn't make an electric vehicle very practical for me to drive to and from court, even though I would go out when he had conflicts, go sit in Bismarck and sit for a day, hear cases, and turn around and drive back. And it seems as though that in this rulemaking process, nobody took into consideration that difference in driving patterns. The department looked at the petitioners and others submitted studies about the driving patterns. The department looked at them. And the department recognized that there were some studies suggesting that electric vehicles are driven less. There are other studies suggesting that electric vehicles are driven just as much or even more than gasoline-powered vehicles. But the department also recognized that all of these studies are of limited value because they're necessarily retrospective. They're looking at past model years of electric vehicles. And the Department of Energy recognized that electric vehicles are currently driven somewhat less than comparable gasoline-powered vehicles. But it noted that the difference between them is shrinking, that newer electric vehicles will have longer ranges, which is a major factor, as you say, Judge Erickson, in causing some electric vehicles to be driven less. And the department noted also the ongoing deployment of a national charging network that will ensure that electric vehicles can match the utility and driving needs of gasoline-powered vehicles. So, looking forward to model year 2027 vehicles and beyond, the department exercised its expertise, its technical judgment, to determine that electric vehicles are likely to be driven similarly to gasoline-powered vehicles. And that exercise of judgment in the face of imperfect data was reasonable. And this Court, under the APA, should not second-guess that expert decision. Petitioner's next challenge is to the two-cycle test procedure that's used to test the energy The statute requires that the fuel economy of passenger autos generally be measured using the two-cycle test. And since 2000, electric vehicles have been tested the same way, using that two-cycle urban and highway test. And the Department of Energy explained that the purpose of the petroleum equivalency factor is to provide a fuel economy conversion factor for electric vehicles, so it's reasonable and appropriate to keep all else equal, including the procedures for testing the driving efficiency of each vehicle type. Now there's no dispute that the two-cycle test provides a rough approximation of fuel economy and that it overstates fuel economy by a certain amount. But that is true both for electric vehicles and gasoline-powered vehicles. And there's no evidence that the test is more flawed for one type of vehicle than the other. And so because the two-cycle test is statutorily required for gasoline-powered vehicles, the Department of Energy determined that it would further the goal of determining the equivalent petroleum-based fuel economy to use the same testing procedure for electric vehicles. And in fact, it would be more problematic to use a different test because you wouldn't get a reasonable comparison of the energy efficiency of electric vehicles to that of gasoline-powered vehicles. So the argument essentially is that, say if you went to like a five-factor test, that it would, you know, it's not necessarily more accurate in the results that it turns out and that even if it is, we're still mandated to do the two-factor test for gasoline-powered vehicles and so we'd be comparing apples to oranges? That's right. And I think that the five-cycle test is more accurate and that's why EPA uses it to determine the fuel economy rating that's going to go on that window sticker to tell the consumer what the fuel economy level is, but we're statutorily mandated to use the two-cycle test. And so to use the, you know, a test that we know overstates the fuel economy of vehicles for one set of vehicles and then to use a more accurate test for another set of vehicles, as you say, is going to be comparing apples and oranges. You're not going to get a good comparison. Turning to a remedy, unless this Court has further questions on the merits, if there's any error in the rulemaking, the APA allows this Court to set aside the challenged agency action, which is the final rule, but the rule under review replaced another 25-year-old petroleum equivalency factor. So vacating the final rule would mean that the prior petroleum equivalency factor, the regulation, would spring back into place. In other words, if this Court vacates the replacement regulation, then we're simply left with the original regulation. If they could or would not vacate the 2000 rule and the petroleum equivalency factor established in that rulemaking, again, petitioners are 25 years too late to challenge that rulemaking. The only case that petitioners cite in support of their proposed remedy, which is to vacate not only this rule but also the 2000 rule, they cite in their reply, but I want to make it very clear, is the small refiner lead phase-down task force versus EPA. They quote a phrase from that case. If you take a look at the case, it does not stand for the remedy that petitioners ask for. There, the Court said that vacating the challenged agency action would put in place a prior rule that would not be consistent with the statute. But the Court did not then vacate the challenged agency action and the prior one, leaving a regulatory vacuum. Instead, the Court delayed the issuance of its mandate, leaving the challenged rule in place temporarily to allow the EPA to fill the regulatory gap with an emergency rule issued without notice and comment. But petitioners aren't asking for that here. What they're asking for is for this Court to issue its mandate, leaving a regulatory gap. There is no basis for that. Small refiner lead phase-down is inconsistent with petitioners' requested remedy. It's also inconsistent with this Court's decision in Menorah Medical Center v. Heckler, which petitioners cite, United Steel v. Mine Safety and Health Administration, D.C. circuit case that we cite in our brief, which hold that when a final rule that replaced a prior rule is set aside, the prior rule is reinstated. Given that the 2000 regulation would come back into effect if this Court vacates the final rule at issue here, the correct remedy, the proper remedy, if there's any error at all, would be remand without vacater. Putting back in place the 2000 regulation would establish a higher petroleum equivalency factor. Now, petitioners are arguing that the petroleum equivalency factor in the current rule is still too high. So putting back in place the 2000 rule would only exacerbate the alleged injuries that petitioners claim. It would also be inconsistent with the statutory goals. So in a case like this, the proper remedy is remand without vacater. Vacater would also significantly disrupt the reliance interests of automakers who, of course, plan their capital expenditures, make their production and design decisions in a multi-year time horizon. I also want to make clear that there's no basis to vacate or for there to be any remedy with regard to model year 2024 to 2026 vehicles. Petitioners ask this Court to vacate a petroleum equivalency factor starting in model year 2024. But the final rule at issue here replaces the prior regulation beginning in model year 2027. So the rule at issue here says nothing about model years 2024 to 2026. Those years are governed by the 2000 rulemaking, which, again, is not subject to challenge here, and it is far too late to challenge those here. Contrary to petitioners' argument, the 2024 rule did not readopt the petroleum equivalency factor for model year 2024 to 2026. It left that alone and established a replacement petroleum equivalency factor for model year 2027 and beyond. I'm happy to answer any further questions if the Court has any. Otherwise, we ask that the Court deny the petition for review. I see no questions. Thank you, Mr. Koppel. Thank you. Thank you. I'd like to make a few points here, starting with what I didn't hear in that presentation. I didn't hear anything that closely parsed the text of that third factor. I didn't hear any response to the point that it would obviate effectively the other three factors in the statute. I didn't hear any response beyond acknowledging that in 2000, the DOE took this fuel content factor over from ethanol and applied it to EVs for consistency or convenience rather than anything in the actual law. And that, I think, is dispositive. Those points go to the heart of this case, which is that there is no textual basis in 32904 or 32905 for the fuel content factor, as the agency said in the proposal. A couple other cleanup things. The current renewable portfolio or percentage for the grid is 21.4 percent. This is in a footnote in our brief, I believe it's footnote two. It's pretty aggressive to get too close to 50 percent in just the next few years. We do say that that's unrealistic. And it goes to the larger point, which is they're not actually considering scarcity or value here. They're driving an industrial policy to incentivize electrification. You don't need my construing that to get to that conclusion. The agency says that itself. And you're right, Judge Benton, that the point about value has to include cost. And whether there's some additional discretion for different methodologies, that doesn't get you what the government says they have here, which is this power to set the incentives for electric vehicles at whatever they deem appropriate. On these other points that have been raised, on the use of these vehicles, there's a reason why people don't buy Ford F-150 Lightnings for towing things and working on the farm nearly as much as they buy normal F-150s with an internal combustion engine. It's because they're not equivalently capable. And the government says, well, maybe they will be in the future, but they don't have data to support that. They don't also confront the reality that the types of the portfolios, the different breakdown of what kind of vehicles are being made that are electric versus not electric is different. So there are more trucks that are conventional trucks for those very good reasons, the better towing capacity range, those sort of things. There are more passenger vehicles as a percentage value for EVs. EVs work great in cities. They have a lot of advantages there. But if you're further away, if you've got to drive in places where there isn't as much charging infrastructure, if you have to drive in cold weather, those things all make a big difference. And the government's point is that we just think that's going to go away for reasons they never bother to really explain. In terms of the way the grid is going to change, they have three crystal ball inquiries that they endeavor to take. First of all, they never made this methodology available for comment, which is alone a violation of the APA, which requires notice and opportunity for comment on the actual substance of the proposal. They pull it out of a hat at the end. And then this methodology requires looking far into the future, into 2070, to see what the grid's going to be like then. It requires looking far into the future to see what this composition of the fleet's going to be, how many trucks, how many passenger vehicles, how many SUVs. And it requires looking into the future to see how long these EVs are going to be on the road. Now, they have some data on that first point. They really have no data on the second and third. They don't have anything. They just state their belief. The factors, as I mentioned, are all fact-finding kind of inquiries. And so it's arbitrary and capricious for an agency to just make a claim without backing that up with anything. Similarly, when they talk about the way in which the two-cycle test is used, one point is that they say – well, we had – we responded to comments with some studies. The proposal – the one thing they cite in the proposal is literally a press release that says that the Biden-Harris administration is going to have more charging infrastructure. That is not the kind of evidence that can support this very big claim that they make about where the future is going to be for electric vehicles. And then they cherry-pick one study, the UC Davis study, on that and do not adequately wrestle with the other studies and just common sense that shows that electric vehicles are used differently. As to the apples-to-apples comparison, I think this is really key. What Mr. Koppel said is that it's important to have the same test proceedings because it's key that we have equivalent numbers. Well, that's the heart of this case. It's about a real-world equivalency between electric vehicles and conventional vehicles. And the government understands that when it's talking about this. I think they reached the wrong conclusion. The way they analyze this is they say, well, it's the same test. Well, the same test can be – it's inaccurate for everyone. It is more inaccurate for electric vehicles. And there are obvious reasons for this. For instance, you turn the heater on in a gas-powered car, that's using waste energy from the vehicle to heat you. If you're in an electric vehicle, it's drawing that off the battery. So that's going to hurt efficiency in a much more significant way than in a conventional vehicle. So that's why EPA actually adjusts the two-cycle test. And it has a greater adjustment for EVs, for most EVs, precisely because of that difference. So we agree that equivalency is the point. What we disagree on is that you need to apply the same test woodenly to get an apples-to-apples comparison. Also, if you're looking at where things are being driven, electric vehicles tend to be driven more in the cities. They work better for that application. You can charge it at work or at your home. So that difference in how much time is spent on the road, on the highway, how much time is spent in the city, that's, again, a salient difference that goes to a really important point with this. And finally, on the last point about the remedy, the court has equitable authority to craft the right kind of remedy here. And the point that we cite from the D.C. Circuit case, the refining case, the lead refining case, is that there is discretion to not just resurrect a rule if it's going to end this. The D.C. Circuit appears to be very flexible in how they do the remedies. That's correct, Your Honor. But our cases aren't quite that flexible. Do you really want us to vacate the 2000 rule too? So I see my time has expired. You can answer the question. Thank you. So two things. One is we're faulted for not challenging the 2000 rule back then. Of course, we wouldn't have standing because there were no electric vehicles on the road. It would have made no real world difference. Two, what we want is a petroleum equivalency factor that is actually equivalent. And so whether it's holding the mandate and remanding, whether it's vacating starting in model year 2025 or 2026 or 2027, there are different remedies I think the court can craft that we would be fine with. What we don't want is what you were concerned about, I think, in your questions, Your Honor, about the annual review. If it's just remanded without vacatur, this is an agency that has not done its statutory duty of reviewing this factor every year and making sure that it's accurate. And so remand without vacatur would invite that same kind of problem. I don't think it's stretching or out of line with any of the precedents of this Court to have a partial vacatur or have a vacatur that starts at a certain year and then goes forward. And it's much more important to us that we get some real change going forward than that we have something that knocks out prior years. It's really about a prospective issue. Unless there are further questions, thank you, Your Honor. I see none. Thank you, Mr. Bushbacher. The Court wishes to express its appreciation to all counsel for participating in argument before the Court this morning. It's been helpful. We'll continue to study the record and render decision in due course. Thank you.